IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

EBONY SAMUEL, SIDDEEQUAH
A. McCRAE, CIERA COLBERT, and
TAMMY ENGLISH,

     Plaintiffs,

v.

DERMATOLOGY ASSOCIATES OF
ATLANTA, P.C. and DR. EDMOND
I. GRIFFIN,

     Defendants.

CIVIL ACTION FILE

No. 1:21-cv-_____

JURY TRIAL DEMANDED

## **COMPLAINT**

Plaintiffs Ebony Samuel, Tammy English, Ciera Colbert, and Siddeequah A. McCrae (collectively, "Plaintiffs") bring this action against their former employer, Dermatology Associates of Atlanta, P.C. ("DAA") and the founder of that practice, Dr. Edmond I. Griffin ("Defendant Griffin"), showing the Court as follows:

### *Introduction*

1.

Plaintiffs bring this action pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) *et seq.*, as amended and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended by the Civil Rights Act of

1991, for damages to compensate them for economic loss and other injuries they have sustained as a consequence of unlawful employment practices committed against them on account of their race and/or religion and to retaliate against them for raising issues related to ongoing and pervasive discrimination at DAA. Plaintiff Colbert additionally asserts claims against DAA for its discriminatory and retaliatory actions in violation of the Americans with Disabilities Act Amendments Act ("ADA").

### Parties, Jurisdiction, and Venue

#### 2.

This Court has jurisdiction over the subject matter of this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.* and 28 U.S.C. § 1331 and 1367.

#### 3.

DAA is a for profit corporation, organized and existing under the laws of the State of Georgia.  DAA can be served by and through its registered agent Edmond I. Griffin at 605 Cambridge Way, Atlanta, Georgia, 30328**.**

#### 4.

Defendant Griffin is a natural person and a resident of the State of Georgia. Defendant Griffin may be served at his residence address, 605 Cambridge Way,

Atlanta, Georgia, 30328.  Defendant Griffin is the founder of DAA and all times relevant to this matter was a supervisor of Plaintiffs.

5.

The venue of this action is proper before this Court pursuant to 28 U.S.C. § 1391 because this is the judicial district and division in which DAA resides and in which a substantial part of the events giving rise to this case occurred.  All Plaintiffs are citizens of the United States and were residents of Fulton County, Georgia, during their employment with Defendant DAA.

### Background Facts: Ebony Samuel

6.

Plaintiff Ebony Samuel is a former employee of DAA.  Plaintiff Samuel is a bi-racial African American woman and a Muslim.

7.

Plaintiff Samuel began her employment with DAA in or about November 2014 as a medical assistant ("MA").

8.

On numerous occasions throughout her years-long employment with DAA, Plaintiff Samuel was subjected to verbal abuse and harassment by Defendant Griffin and DAA's office manager, Sharon Williams, because of her race and religion.

- 3 -

9.

In March 2019, Plaintiff Samuel was present when Plaintiff McCrae was wearing a scarf on her head and Defendant Griffin asked her what she was wearing. When Plaintiff McCrae explained that it was a scarf, Defendant Griffin explained that he thought it was "one of those things Muslims wear on their heads" and although wearing a regular head scarf was fine, wearing a hajib in the office would not be allowed.

10.

Defendant Griffin did not bother to explain why wearing a scarf was deemed appropriate but wearing a hajib was not. Despite this incident being reported to Ms. Williams, she claimed there was nothing that could be done since Defendant Griffin was the founder of the practice. Defendants further never bothered to explain why one employee was allowed to wear his yarmulke but why wearing a hijab was not allowed.

11.

Defendant Griffin also screamed and raved at African Americans in the office, including Plaintiff Samuel, on a frequent basis but never did so with white employees.

12.

Defendant Griffin also called Plaintiff Samuel an "oreo" on account of her being a bi-racial African American.

13.

During her time with DAA, Plaintiff Samuel was never disciplined and never had any performance issues.  On the contrary, Ms. Williams, the office manager, frequently praised Plaintiff Samuel for her work ethic, the speed with which she learned new skills, and her ability and willingness to train other MAs.

14.

Plaintiff Samuel filed her first Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on July 30, 2019, and her second Charge of Discrimination on September 27, 2019.  True and correct copies of her Charges of Discrimination are attached hereto as composite **Exhibit "1."**

15.

Within a few weeks of filing her first Charge of Discrimination in which she alleged both racial and religious discrimination, Plaintiff Samuel was notified that she would be terminated and was ultimately terminated from her position as an MA on August 22, 2019. At the time of her discharge there were open positions that

Plaintiff Samuel was competent to fill and for which she applied that were instead filled by white employees.

16.

On or about April 8, 2021, the EEOC issued Plaintiff Samuel Notices of Right to Sue.  True and correct copies of the Notices of Right to Sue are attached hereto as composite **Exhibit "2."**

17.

Plaintiff Samuel has timely filed her Complaint within 90 days of her receipt of the Notices of Right to Sue, and she has therefore satisfied all administrative and statutory prerequisites to bringing her claims under Title VII.

### *Background Facts: Tammy English*

18.

Plaintiff Tammy English is a former employee of DAA. Plaintiff is an African American woman.

19.

Plaintiff English began her employment with DAA in or about March 2013 as an MA.

20.

On numerous occasions throughout her years-long employment with DAA, Plaintiff English was subjected to verbal abuse and harassment by Defendant Griffin and Ms. Williams because of her race.

21.

Defendant Griffin screamed and raved at African Americans in the office, including Plaintiff English, on a frequent basis but never did so with white employees.

22.

On one occasion, Defendant Griffin called Plaintiff English a "white snowman," a means of derogatorily referring to her race.

23.

Defendant Griffin also appeared to delight in telling African American employees of DAA, including Plaintiff English, that his family once owned African American slaves and referred to eating "slave food."

24.

Defendant Griffin also in the presence of Plaintiff English mocked black children who rode on school buses, saying that when he saw them, because they

were so dark skinned, the only thing he could see was the whites of their eyes. Defendant Griffin appeared to find this quite humorous.

25.

Plaintiff English filed her Charges of Discrimination with the with the EEOC June 4, 2019, and September 27, 2019.  True and correct copies of her Charges of Discrimination are attached hereto as composite **Exhibit "3."**

26.

Within a couple of months of filing her first Charge of Discrimination, Plaintiff English was notified that she would be terminated and was ultimately terminated from her position as an MA on August 22, 2019. At the time of her discharge there were open positions that Plaintiff English was competent to fill and for which she applied that were instead filled by white employees.

27.

On or about April 8, 2021, the EEOC issued Plaintiff English Notices of Right to Sue.  True and correct copies of the Notices of Right to Sue are attached hereto as composite **Exhibit "4."**

28.

Plaintiff English has timely filed her Complaint within 90 days of her receipt of the Notices of Right to Sue, and she has therefore satisfied all administrative and statutory prerequisites to bringing her claims under Title VII.

### Background Facts: Ciera Colbert

29.

Plaintiff Ciera Colbert is a former employee of DAA.  Plaintiff is an African American woman.

30.

Plaintiff Colbert began her full-time employment with DAA as an MA in or about March 2017.

31.

Plaintiff Colbert was subjected to verbal abuse and harassment by Defendant Griffin and Ms. Williams because of her race.

32.

Defendant Griffin screamed and raved at African Americans in the office, including Plaintiff Colbert, on a frequent basis but never did so with white employees.

33.

Plaintiff Colbert also endured unequal terms and conditions of employment. In particular, she was not provided an appropriate workstation but instead provided a partially broken desk and stool to sit on. When her desk eventually fell apart, she was forced to use the top of a refrigerator as a makeshift desk.

34.

Despite repeated requests to provide her with an appropriate workstation and an offer to pay for one out of her own pockets, DAA never provided Plaintiff Colbert with an appropriate workstation. In contrast to Plaintiff Colbert's workstation, white MAs were provided appropriate workstations.

35.

Plaintiff Colbert was also subjected to abuse on account of a disability. As a result of the racially hostile work environment created by Defendants, in or around January 2019, Plaintiff Colbert suffered an anxiety attack.

36.

At the time of her anxiety attack Plaintiff Colbert directly informed Ms. Williams that she had been diagnosed with and suffered from anxiety and depression ever since she was a teenager. Further and upon request by Ms. Williams, Plaintiff

Colbert informed Ms. Williams of the medications she was taking for her anxiety and depression.

37.

Plaintiff Colbert also informed Plaintiff English, as her team lead, of her diagnosis and medications, and Plaintiff English, at the request of Plaintiff Colbert, discussed Plaintiff Colbert's diagnosis and prior anxiety attack with Ms. Williams. During this discussion, Ms. Williams informed Plaintiff English that Plaintiff Colbert's anxiety and depression and resulting anxiety attacks were a "liability" and stated that Plaintiff Colbert would be terminated if she suffered another anxiety attack.

38.

Furthermore, the day after Plaintiff Colbert suffered her anxiety attack, Ms. Williams walked through the halls within the hearing of Plaintiff Colbert and mocked the notion of employees having anxiety attacks and fainting at work.

39.

As a result of Plaintiff Colbert's fear of termination based upon Ms. Williams's threat to fire Plaintiff Colbert if she suffered another anxiety attack, Plaintiff Colbert, with help from the other Plaintiffs, would seclude herself in a room away from Ms. Williams whenever she had an anxiety attack.

40.

Plaintiff Colbert filed her Charges of Discrimination with the with the EEOC on June 4, 2019, and September 27, 2019.  True and correct copies her Charges of Discrimination are attached hereto as composite **Exhibit "5."**

41.

Within a couple of months of filing her first Charge of Discrimination in which she alleged both racial and disability discrimination, Plaintiff Colbert was notified that she would be terminated and was ultimately terminated from her position as an MA on August 22, 2019. At the time of her discharge there were open positions that Plaintiff Colbert was competent to fill and for which she applied that were instead filled by white employees.

42.

On or about April 8, 2021, the EEOC issued Plaintiff Colbert Notices of Right to Sue.  True and correct copies of the Notices of Right to Sue are attached hereto as composite **Exhibit "6."**

43.

Plaintiff Colbert has timely filed her Complaint within 90 days of her receipt of the Notices of Right to Sue, and she has therefore satisfied all administrative and statutory prerequisites to bringing her claims under Title VII and the ADA.

***Background Facts: Siddeequah McCrae***

44.

Plaintiff Siddeequah McCrae is a former employee of DAA. Plaintiff McCrae is an African American woman and a Muslim.

45.

Plaintiff McCrae began her employment with DAA in or about August 2014 as a front desk specialist ("FDS").

46.

During her employment with DAA, Plaintiff McCrae was subject to abuse and harassment by Defendants on account of her religion.

47.

In March 2019, Plaintiff McCrae was wearing a scarf on her head and asked by Defendant Griffin, in the presence of Plaintiff Samuel, about the scarf. Defendant Griffin told Plaintiff McCrae that he thought the scarf was "one of those things Muslims wear on their heads" and that although wearing a head scarf was fine, wearing a hajib in the office would not be appropriate.

48.

Plaintiff McCrae, like Plaintiff Samuel, was struck by the fact that Defendant Griffin apparently considered wearing a scarf in the office to be appropriate, while

wearing a hajib was not. When this incident was reported to the office manager, Ms. Williams, she claimed there was nothing that could be done since Defendant Griffin was the founder of the practice. Defendants further never bothered to explain why one employee was allowed to wear his yarmulke but why wearing a hijab was not allowed.

49.

Plaintiff McCrae was also subjected to verbal abuse, harassment, and bullying by Defendant Griffin and Ms. Williams because of her race.

50.

Defendant Griffin screamed and raved at African Americans in the office, including Plaintiff McCrae, on a frequent basis but never did so with white employees. Specifically, on or about May 22, 2019, Defendant Griffin verbally harassed, degraded, and embarrassed Plaintiff McCrae in front of patients and co-workers as a result of a patient allegedly taking too long to complete paperwork. Later that same day, Plaintiff McCrae submitted a written complaint of the harassment to Ms. Williams and, when Ms. Williams did not respond, met with Ms. Williams in person to complain of Defendant Griffin's harassment. Despite Plaintiff McCrae's complaint, Ms. Williams informed Plaintiff McCrae that there was nothing she could do since Defendant Griffin was the founder of the practice.

51.

Ms. Williams also told African American employees that they could not to wear their hair in braids.

52.

Plaintiff McRae also endured unequal terms and conditions of employment. In particular, she was not provided a chair to sit in while working the front desk. Consequently, Plaintiff McCrae was forced to stand all day long while other white FDSs were provided with chairs and were able to sit during the workday.

53.

Additionally, Plaintiff McCrae was paid less than white FDSs despite working for DAA for longer than these white FDSs, some of whom she trained and whose starting rates of pay were higher than Plaintiff McCrae's.

54.

Plaintiff McCrae filed her Charge of Discrimination with the with the EEOC on May 30, 2019. A true and correct copy her Charge of Discrimination is attached hereto as **Exhibit "7."**

55.

Based on the hostile work environment and unequal terms and conditions of employment created by Defendants, Plaintiff McCrae was constructively discharged

and felt forced to resign from her position with DAA on December 19, 2019. At the time of her resignation, Plaintiff McCrae still made less than white FDSs despite working for DAA for longer than these white FDSs.

56.

On or about April 8, 2021, the EEOC issued Plaintiff McCrae a Notice of Right to Sue, a true and correct copy of which is attached hereto as **Exhibit "8."**

57.

Plaintiff McCrae has timely filed her Complaint within 90 days of her receipt of the Notice of Right to Sue, and she has therefore satisfied all administrative and statutory prerequisites to bringing her claim under Title VII.

### *Allegations Common to Plaintiffs Samuel, English, and Colbert*

58.

Plaintiffs Samuel, English, and Colbert worked with Dr. Stephen Kraus.  Dr. Kraus was a survivor of cancer at the time, and when he had a relapse in the Summer of 2019, he left the practice on or about July 31, 2019 and died on October 28, 2019.

59.

When Dr. Kraus left the practice, Plaintiffs Samuel, English, and Colbert made it clear that they wished to retain their jobs with DAA and would accept

- 16 -

reassignment to other providers within the group and perform other services that were part of the practice's service offerings.

60.

Plaintiffs Samuel, English, and Colbert were capable of and qualified for performing services that the practice offered following Dr. Kraus's departure since they had performed many of the services in the available positions during their employment with DAA.

61.

Nonetheless, following Dr. Kraus's departure, DAA immediately decided to terminate Plaintiffs Samuel, English, and Colbert.

62.

Although Plaintiffs Samuel, English, and Colbert wished to keep their jobs following Dr. Kraus's departure, they were terminated, and white applicants with less experience and qualifications were hired to fill available and unfilled job positions.

63.

Plaintiffs Samuel, English, and Colbert were not invited to take the available and unfilled jobs that were given to the new white employees because of their race

and/or religion and as retaliation for having filed Charges of Discrimination with the EEOC.

### Facts Relevant to All Plaintiffs

64.

All Plaintiffs were paid less that white employees who performed the same type of work requiring equal skill, effort, and responsibility, and which are performed under similar working conditions.

65.

On many occasions, white employees received annual raises and/or bonuses while Plaintiffs would receive no compensation review and no raise or bonus despite receiving satisfactory (or better) performance reviews.

66.

All Plaintiffs were denied the opportunity to work overtime to make additional money. When overtime work was available, the work would be assigned to white employees, or an African American employee, including one of the Plaintiffs, would be told to clock out.

67.

DAA operates its practice out of eight (8) suites at the 5555 Peachtree Dunwoody Building.   When DAA hired African American employees, those

employees would almost exclusively, if not exclusively, be assigned to Suite 190. The other seven (7) suites were virtually, if not entirely, all white.  In short, DAA segregated its employees into an African American suite, Suite 190, and white suites, all the rest.

68.

Dr. Griffin worked in Suite 190 and as described in above allegations, engaged in severe and pervasive harassment and intimidation of African American employees.

69.

The racially hostile work environment further manifested itself in racial comments made by Defendant Griffin on a regular basis. For example, Defendant Griffin would often lament the fact that he believed that African American employees felt entitled to take off for the Martin Luther King Holiday.

70.

Despite complaints about DAA's racially hostile environment, including but not limited to Dr. Griffin's harassment, DAA failed to take action. Instead, Ms. Williams would often comment to Plaintiffs that Defendant Griffin could not be disciplined because he was the founder of DAA.

71.

On several occasions when African Americans complained about Defendant Griffin's racial harassment and intimidation they were threatened with termination and, in some instances, terminated on the spot. As such, Defendants created the good faith and rational belief amongst employees, including Plaintiffs, that reporting Defendant Griffin's constant racial harassment would result in reprisal, including termination.

## COUNT I: DISCRIMINATION CLAIM UNDER TITLE VII
## OF THE CIVIL RIGHTS ACT OF 1964
### (*All Plaintiffs*)

72.

Plaintiffs repeat and incorporate by reference herein the allegations of Paragraphs 1 through 71 of the Complaint.

73.

Throughout their employment with DAA, Plaintiffs were members of various classes protected by Title VII of the Civil Rights Act of 1964.

74.

During their employment with DAA, all Plaintiffs were forced to endure harassing and disparaging remarks and bullying from Dr. Griffin and Ms. Williams that were directed almost exclusively at African American employees of DAA.

Although Plaintiffs reported such incidents to Ms. Williams as the Office Manager, nothing was ever done to discourage such conduct or discipline employees who were responsible for creating a racially hostile environment.

75.

Additionally, DAA segregated its workforce into seven (7) white suites and a separate and unequal African American suite.

76.

In addition, Plaintiffs' race was a motivating factor leading to unequal treatment experienced by all Plaintiffs and the termination of Plaintiffs Samuel, English, and Colbert by DAA, and the constructive discharge of Plaintiff McCrae.

77.

As a direct, legal, and proximate result of said discrimination, Plaintiffs have sustained economic and emotional injuries, resulting in damages in an amount to be proven at trial.  Plaintiffs are entitled to recover back pay, future monetary losses, and compensation for mental anguish and inconvenience.

78.

DAA's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination based on race, entitling Plaintiffs to recover punitive damages.

79.

Plaintiffs are entitled to recover their reasonable attorneys' fees and costs of suit.

## COUNT II: DISCRIMINATION CLAIM UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### (*Plaintiffs Samuel and McCrae*)

80.

Plaintiffs repeat and incorporate by reference herein the allegations of Paragraphs 1 through 71 of the Complaint.

81.

Throughout their employment with DAA, Plaintiffs, as African American female Muslims, were members of various classes protected by Title VII of the Civil Rights Act of 1964.

82.

During their employment with DAA, Plaintiffs Samuel and McCrae were treated differently by Defendants on account of their religious beliefs. Although Plaintiffs Samuel and McCrae reported such incidents to Ms. Williams as the Office Manager, nothing was ever done to discourage such conduct or discipline employees who were responsible for their different treatment on account of their religious

beliefs. Further, other employees who were not Muslim were treated differently from Plaintiffs.

83.

In addition, Plaintiffs' religious beliefs were motivating factors leading to unequal treatment experienced by Plaintiffs and the termination of Plaintiff Samuel and constructive discharge of Plaintiff McCrae.

84.

As a direct, legal, and proximate result of said discrimination, Plaintiffs have sustained economic and emotional injuries, resulting in damages in an amount to be proven at trial and are entitled to recover back pay, future monetary losses, and compensation for mental anguish and inconvenience.

85.

DAA's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination based on religion, entitling Plaintiffs to recover punitive damages.

86.

Plaintiffs are entitled to recover their reasonable attorneys' fees and costs of suit.

## COUNT III: RETALIATION UNDER TITLE VII
### (*Plaintiffs Samuel, English, and Colbert*)

87.

Plaintiffs repeat and incorporate by reference herein the allegations of Paragraphs 1 through 71 of the Complaint.

88.

Plaintiffs reported Defendant Griffin's racist and religiously bigoted comments, harassment, and bullying, and other acts of racial and religious animus and toxic work environment to Ms. Williams, DAA's office manager and the person designated to receive such complaints.

89.

Within a short time-period after filing their first Charges of Discrimination with the EEOC and immediately after Dr. Kraus's death, Plaintiffs Samuel, English, and Colbert were notified that they would be terminated by DAA.

90.

Plaintiffs Samuel, English, and Colbert are entitled to recover back pay, future monetary losses, and compensation for mental anguish and inconvenience for the violations described herein.

91.

DAA has acted with malice or reckless indifference to Plaintiffs Samuel, English, and Colbert's rights, entitling them to recover punitive damages.

92.

Plaintiffs Samuel, English, and Colbert are also entitled to recover their costs of litigation, including reasonable attorneys' fees.

## COUNT IV: DISCRIMINATION CLAIM
## PURSUANT TO 42 U.S.C. § 1981
### (*All Plaintiffs*)

93.

Plaintiffs repeat and incorporate by reference herein the allegations of Paragraphs 1 through 71 of the Complaint.

94.

42 U.S.C. § 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

95.

"'Make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

96.

Plaintiffs are all "person[s] within the jurisdiction of the United States."

97.

Plaintiffs worked for DAA for years before they were each terminated on pretextual grounds despite their unblemished disciplinary record and their history of excellent to acceptable job performance.

98.

During their employment with DAA, Plaintiffs were forced to endure harassing and disparaging remarks from Defendant Griffin, a direct supervisor of Plaintiffs, and other employees of DAA on account of their race. Such comments were severe and pervasive and made on a regular basis.

99.

Comparable white employees were not subject to such racial harassment and disparaging remarks.

100.

Although Plaintiffs reported such incidents to upper management at DAA, nothing was ever done to discourage such conduct or discipline employees who were responsible for creating a racially hostile environment. Instead, Plaintiffs Samuel, English, and Colbert were terminated and Plaintiff McCrae was constructively discharged because of their race and complaints of racial harassment.

101.

By the conduct described herein, Defendants intentionally deprived Plaintiffs of the same rights as are enjoyed by white citizens to the creation, performance, enjoyment, and all benefits and privileges, of their contractual employment relationship with DAA, in violation of 42 U.S.C. § 1981.

102.

As a direct, legal, and proximate result of the discrimination, Plaintiffs have sustained economic and emotional injuries, resulting in damages in an amount to be proven at trial. Plaintiffs are entitled to recover back pay, future monetary losses, and compensation for mental anguish and inconvenience.

103.

Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination based on race, entitling Plaintiffs to recover punitive damages.

104.

Plaintiffs are entitled to recover their reasonable attorneys' fees and costs of suit.

## COUNT V: RETALIATION CLAIM PURSUANT TO 42 U.S.C. § 1981
### (*Plaintiffs Samuel, English, and Colbert*)

105.

Plaintiffs repeat and incorporate by reference herein the allegations of Paragraphs 1 through 71 of the Complaint.

106.

During their employment with DAA, Plaintiffs Samuel, English, and Colbert were forced to endure harassing and disparaging remarks from Defendant Griffin and employees of DAA on account of their race.

107.

Plaintiffs made multiple complaints to DAA regarding the racially hostile work environment created by Defendant Griffin and DAA employees.  Ultimately, Plaintiffs each filed Charges of Discrimination with the EEOC.

108.

In response to Plaintiffs' complaints of a racially hostile work environment and their Charges of Discrimination, DAA, including Defendant Griffin as founder of DAA and a supervisor of Plaintiffs, took materially adverse actions against Plaintiffs, including, but not limited to, terminating their employment despite their unblemished disciplinary record and their history of excellent to acceptable job performance.

109.

Defendants did not take similar materially adverse actions with comparable white employees.

110.

Defendants' retaliatory actions would deter a reasonable employee from engaging in activity protected under 42 U.S.C. § 1981.

111.

As a direct, legal, and proximate result of the discrimination, Plaintiffs have sustained economic and emotional injuries, resulting in damages in an amount to be proven at trial.  They are entitled to recover back pay, future monetary losses, and compensation for mental anguish and inconvenience.

112.

Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination based on race, entitling Plaintiffs to recover punitive damages.

113.

Plaintiffs are entitled to recover their reasonable attorneys' fees and costs of suit.

## COUNT VI: DISCRIMINATION CLAIM UNDER THE ADA
### (*Plaintiff Colbert*)

114.

Plaintiff Colbert repeats and incorporates by reference herein the allegations of Paragraphs 1 through 71 of the Complaint.

115.

The ADA prohibits discrimination against a person with a disability.

116.

Plaintiff's diagnosed anxiety and depression constitute a disability under the ADA.

117.

DAA was aware that Plaintiff had a disability.

118.

Alternatively, DAA perceived Plaintiff to be disabled.

119.

By failing to inform Plaintiff of her rights under the ADA, including the right to accommodations and by failing to engage in the interactive process, DAA discriminated against Plaintiff because of her disability or DAA's perception of Plaintiff having a disability.

120.

Further, by mocking employees who suffered from anxiety attacks and fainting and by threatening to terminate Plaintiff for anxiety attacks associated with her disability, DAA discriminated against Plaintiff because of her disability or DAA's perception of Plaintiff having a disability.

121.

Plaintiff could perform the essential functions of her job with accommodation.

122.

DAA's discriminatory and illegal actions against Plaintiff violated the ADA.

123.

As a direct, legal, and proximate result of the discrimination, Plaintiff has sustained economic and emotional injuries, resulting in damages in an amount to be

proven at trial.  Plaintiff is entitled to recover back pay, future monetary losses, and compensation for mental anguish and inconvenience.

124.

Defendant DAA's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on disability, entitling Plaintiff to recover punitive damages.

125.

Plaintiff is entitled to recover her reasonable attorneys' fees and costs of suit.

## COUNT VII: RETALIATION CLAIM UNDER THE ADA
### (*Plaintiff Colbert*)

126.

Plaintiff repeats and incorporates by reference herein the allegations of Paragraphs 1 through 71 of the Complaint.

127.

The ADA prohibits retaliation against a person with a disability.

128.

Plaintiff's diagnosed anxiety and depression constitute a disability under the ADA.

129.

DAA was aware that Plaintiff had a disability.

130.

Alternatively, DAA perceived Plaintiff to be disabled.

131.

Plaintiff engaged in protected activity by informing DAA of her disability. Further, after being threatened with termination because of her disability, Plaintiff further engaged in protected activity by filing her first Charge of Discrimination with the EEOC alleging, among others, discrimination under the ADA.

132.

By mocking employees who suffered from anxiety attacks and fainting and by threatening to terminate Plaintiff for anxiety attacks associated with her disability, DAA retaliated against Plaintiff because of her disability or DAA's perception of Plaintiff having a disability.

133.

Within a couple of months of filing her first Charge of Discrimination in which she alleged disability discrimination, Plaintiff Colbert was notified that she would be terminated and was ultimately terminated from her position by DAA. Such adverse action was taken in retaliation for Plaintiff filing her first Charge of Discrimination with the EEOC.

134.

At all times relevant hereto, Plaintiff could perform the essential functions of her job with accommodation.

135.

DAA's retaliatory and illegal actions against Plaintiff violated the ADA.

136.

As a direct, legal, and proximate result of the retaliation, Plaintiff has sustained economic and emotional injuries, resulting in damages in an amount to be proven at trial.  Plaintiff is entitled to recover back pay, future monetary losses, and compensation for mental anguish and inconvenience.

137.

Defendant DAA's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from retaliation based on disability, entitling Plaintiff to recover punitive damages.

138.

Plaintiff is entitled to recover her reasonable attorneys' fees and costs of suit.

**WHEREFORE**, Plaintiffs prays that they recover the following:

(a)     The Court enjoin Defendants' continuing unlawful employment practices;

(b)     Back pay, front pay, compensation for all their monetary losses, and all monetary awards allowed by law;

(c)     Any additional liquidated damages;

(d)     Punitive damages in an amount to be determined by the enlightened conscience of the jury;

(e)     Litigation costs, including reasonable attorneys' fees; and

(f)     Such other and further relief as the Court may deem appropriate.

This 7th day of July, 2021.

/s/ Cary Ichter
Cary Ichter
Georgia Bar No. 382515
Oladimeji A. Ogunsola
Georgia Bar 857808

**ICHTER DAVIS, LLC**
3340 Peachtree Rd. NE, Suite 1530
Atlanta, GA  30326
404-869-7600 (phone)
404-869-7610 (fax)
cichter@ichterdavis.com
dogunsola@ichterdavis.com

*Attorneys for the Plaintiffs*

## **<u>CERTIFICATION</u>**

Pursuant to Local Rule 7.1(D), undersigned counsel certifies that this filing

has been prepared with one of the font and point selections approved by the Court

in Local Rule 5.1(B).

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
